IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Patricia A. Shelley,        )
                              )
            Plaintiff,   )
                              )
       vs.                 )
                              )
Michael J. Astrue,         )
Commissioner of Social Security, )
                              )
            Defendant.  )
                              )

Civil Action No. 6:08-2869-CMC-WMC

**REPORT OF MAGISTRATE JUDGE**

      This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

      The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

      The plaintiff filed applications for disability insurance benefits (DIB) and supplemental security income (SSI) benefits on February 25, 2004, alleging that she became unable to work on December 31, 2003. The applications were denied initially and on reconsideration by the Social Security Administration. On July 18, 2005, the plaintiff

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

requested a hearing. The administrative law judge, before whom the plaintiff, her attorney, and a witness appeared on March 13, 2006, considered the case *de novo*, and on August 15, 2006, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on June 17, 2008. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

(1)     The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

(2)     The claimant has not engaged in substantial gainful activity since December 31, 2003, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

(3)     The claimant has the following severe impairments: fibromyalgia and depression (20 CFR 404.1520(c) and 416.9209c)).

(4)     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

(5)     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work. The claimant is able to sit/stand/walk six hours each in an eight-hour workday. She is able to occasionally lift 20 pounds and frequently lift ten pounds. The claimant is limited to unskilled work due to her depression.

(6)     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

(7)     The claimant was born on December 3, 1960 and was 43 years old on the alleged disability onset date, which is defined as a younger individual age (20 CFR 404.1563 and 416.963).

(8)    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

(9)    Transferability of job skills is not material to the determination of disability.

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

(11)    The claimant has not been under a "disability," as defined in the Social Security Act, from December 31, 2003 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. §423(a).  "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which

3

equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v.*

*Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 43 years old as of her alleged onset of disability date in December 2003 (Tr. 54, 66).  She has a high school education and worked in the past as a secretary and salesperson (Tr. 72, 76, 313).

### Evidence Before the ALJ

The record reveals that between December 2002 and June 2003, the plaintiff received routine treatment from nurse practitioner Karen Staples, F.N.P., for complaints of fibromyalgia, intermittent asthmatic bronchitis, gastrointestinal reflux disease (GERD), and depression (*see, e.g.*, Tr. 219-29).

The plaintiff also presented to Dr. J. Grant Taylor for evaluation of fibromyalgia in 2003.  Upon examination, she had some tenderness over her upper back and shoulder area and hyperactive reflexes, but full range of motion in all joints with no synovitis (inflammation), normal strength, and normal sensation.  Dr. Taylor found that the

5

plaintiff's symptoms were "consistent with fibromyalgia and anxiety." He explained that the plaintiff had stated several times that she did not think she would be able to continue working, and that he "suspect[ed] she may need to be placed on disability at some point in the future" (Tr. 99-100).

The plaintiff sought treatment approximately seven times between September 2003 and March 2004, for complaints including body pain, bronchitis, syncope spells, memory problems, poor sleep, nausea, and headaches (Tr. 110-15, 216, 218). Upon examination by Dr. Eston Williams in January 2004, she was anxious and had "occasional" rhonchi, but no wheezes and full range of motion in all extremities (Tr. 113). The following month, she had some wheezing and rhonchi and tenderness over her stomach (Tr. 111). Dr. Williams prescribed medications, and told the plaintiff to quit smoking and exercise (Tr. 110-15).

Gastrointestinal studies in March 2004 showed gastritis (inflammation of the stomach), duodenitis (inflammation in the upper small intestine), and a hiatal hernia (Tr. 156, 158-64).

In May 2004, the plaintiff presented to Jonathan Simons, Ph.D., for a psychological evaluation in connection with her application for benefits. She said she was able to care for her personal hygiene, dress herself, visit her granddaughter, talk on the telephone, watch television, perform most household chores (such as vacuuming, dusting, dishes, and laundry), shop, drive, and socialize with friends. Dr. Simons noted that the plaintiff had never had outpatient treatment or hospitalization for psychiatric reasons. An examination showed that she was well-oriented and had poor eye contact, long latencies between questions, an anxious mood, a somewhat constricted affect, logical thinking, the ability to relate adequately, fair judgment and insight, and low-average intellect. Dr. Simons concluded:

6

> Cognitively, [Plaintiff] appears capable of unskilled to semi-skilled work. . . . Consistently poor scores [were] found [on memory testing] . . . However, [Plaintiff's] presentation along with the unusual pattern of scores suggests she may have put forth less than adequate effort on the memory testing. I am not comfortable diagnosing memory problems due to the unusual pattern of scores and my clinical impression that [Plaintiff] is not a good historian. There seems to be at least a possibility of dissimulations/malingering. . . . I do not see a significant amount of credible evidence that she is not capable of functioning in a work setting. She seems capable of handling her own funds.

Dr. Simons diagnosed possible malingering, possible dythymic (depressive) disorder, and possible anxiety disorder (Tr. 188-91).[2]

In October 2004, the plaintiff presented to Dr. Asan Eskander requesting a "letter for disability." Upon examination, she had some tenderness over her stomach and spinal muscles but clear lungs. Straight-leg raise testing (to detect nerve root irritation in the low back) was negative (i.e., normal). She followed up with Dr. Eskander in November 2004. Chest x-rays at that time showed clear lungs, normal heart and pulmonary vessels, and no active disease (Tr. 140-42). An MRI of the low back showed "mild" degenerative changes at L4-L5 and L5 to S1 with no significant spinal stenosis (narrowing) (Tr. 154).

In January 2005, the plaintiff told Ms. Staples that she had fallen, but was able to get up within one or two minutes and did not think she had lost consciousness. Ms. Staples noted that the plaintiff's affect was "much brighter" (Tr. 207).

In March 2005, the plaintiff presented to Dr. Robin Geletka, a rheumatologist, for evaluation of fibromyalgia. Upon examination, the plaintiff had marked psychomotor retardation and diffuse tender points, but was fully oriented, in no acute distress, and had clear lungs, no signs of rigidity or muscle weakness, and no active synovitis of any joint.

---

[2]Two different State agency psychologists reviewed the evidence in July 2004 and May 2005, and found that Plaintiff' mental impairments were not "severe", and caused no restriction in daily activities; only "mild" difficulties in social functioning and concentration, persistence, and pace; and no extended episodes of mental decompensation (Tr. 118-31, 174-87).

Dr. Geletka concluded that although the plaintiff did not have any suicidal ideation, her "major concern" was depression, and that she was "not functioning." She also explained that the plaintiff's fibromyalgia and depression would "not likely improve if her exercise tolerance is not increased," and that her medication was "working effectively for . . . sleep" (Tr. 137-38, *see also* Tr. 139 (follow-up with Dr. Eskander)).

Later that month, the plaintiff presented for a mental health assessment. An examination showed that she had lethargic motor behavior, a worried affect, and an inability to concentrate, but neat grooming and hygiene, relevant speech, and normal thought processes. The evaluator (signature illegible) diagnosed major depressive disorder, a possible personality disorder, and a Global Assessment of Functioning (GAF) score of 42[3] (Tr. 144-49).

In April 2005, the plaintiff complained of having a "major seizure last summer" and generalized weakness. Ms. Staples noted that the plaintiff had hyperactive reflexes, decreased muscle strength in her extremities, and a completely normal score on a mini mental status examination (Tr. 214). An MRI of her brain was also normal (Tr. 171).

In June 2005, the plaintiff told Dr. Williams she had body pain, difficulty sleeping, an inability to concentrate, and "seizures and black [sic] spells." Her abdominal pain and headaches had resolved. The plaintiff's mother said that the plaintiff just sat around all day. On examination, the plaintiff appeared sad and had a poor affect, subjective soreness and muscle tenderness of the neck and back with no muscle spasms,

---

[3]A GAF score is a snapshot of a condition at one point in time, and is not a longitudinal indicator of one's overall level of function. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV), (4th ed. 1994) (GAF provides an assessment of psychological, social, and occupational functioning at one point in time). A GAF of 41 to 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional/rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *See id.*

some wheezes and rhonchi in the lungs, and brisk and equal reflexes in her extremities. Dr. Williams concluded:

> I feel that this patient is unable to do any type of work due to her mental illness and medical condition which has lasted since 5/14/01 and which can be expected to last for a continuous period of at least 12 months or longer in the future. It is my professional medical opinion that this patient has been and will continue to be disabled and unable to maintain gainful employment secondary to the above medical and mental illness.

(Tr. 192).

In late June 2005, Ms. Staples noted that the plaintiff was wearing make-up and had better eye contact (Tr. 208). The following month, Ms. Staples wrote a letter recommending that the plaintiff receive "disability." She stated that the plaintiff had signs of depression and fibromyalgia, and had experienced recent mental and behavioral changes. Ms. Staples explained that the plaintiff answered questions appropriately, but moved in "slow motion" and had a flat affect, hyperactive reflexes, decreased extremity strength, and reported seizure activity. Ms. Staples noted that although an MRI had been normal, the plaintiff needed a full neurological and psychological evaluation. She concluded that the plaintiff had been and would continue to be "unable to work." Jeanne Halyard, M.D., cosigned the letter (Tr. 210-11).

When the plaintiff followed up with Ms. Staples in August 2005, she had a flat affect, but answered questions appropriately (Tr. 205). Four months later, she presented to Ms. Staples of "fainting spells," weakness, and insomnia. Ms. Staples listed the plaintiff's diagnoses as bipolar affective disorder, "mild intermittent" asthma, and fibromyalgia (Tr. 204). In January 2006, the plaintiff presented to Ms. Staples with complaints of feeling like she was going to faint. She scored a "perfect 30" on her mini mental status examination. Ms. Staples recommended a neurological evaluation (Tr. 203).

*Testimony*

In a Daily Activities Questionnaire completed in February 2005, the plaintiff reported that she did not require help with taking care of her personal needs or grooming, and that she was able to drive, grocery shop, prepare meals, and watch movies "a few hours a day." She said someone else did the housework and financial responsibilities. She said she has problems sleeping, but that her eating habits had not changed (Tr. 132-35).

At the administrative hearing in March 2006, the plaintiff testified that she had pain of 10/10 (on a pain scale of one to 10, with 10 being the worst pain possible) "all over" and was fired from her last job because she missed so much work due to fibromyalgia (Tr. 318, 320-22). She later said her pain was 8/10 on average (Tr. 326) and that she took over-the-counter medication ("Goodie's") for her pain (Tr. 328). She said her pain limited her ability to concentrate and remember things (Tr. 326). She said tiredness, weakness, sleep disorder, anxiety, depression, bipolar disorder, and seizures also limited her ability to work (Tr. 324). She said she had "seizures" every week (Tr. 325). She said her daughter cleaned her house for her and brought her dinner every night (Tr. 326-27). She said she could stand only about 15 minutes, had difficulty getting things out of the refrigerator, and dropped things "[e]very couple weeks" (Tr. 328-30). She said she needed to lie down for a couple hours per day, and that she did not do any yard work, engage in social activities, or go to the movies (Tr. 329).

Bonnie Martin, the plaintiff's mother, testified that she saw the plaintiff once a week and talked to her on the telephone several times per day (Tr. 331). Ms. Martin said that she and her husband helped the plaintiff by doing her yard work and "anything she needs to be done," and that the plaintiff's daughter helped her with housework and meal preparation (Tr. 331, 333). Ms. Martin said that she had to accompany the plaintiff to doctor's appointments because the plaintiff was scared to drive and had difficulty comprehending what the doctor told her (Tr. 332). Ms. Martin said that a normal day for the

plaintiff included pain, weakness, and sleep problems, and that she would rate the plaintiff's pain as a 10/10 on most days (Tr. 331, 333). She said that the plaintiff had "spells" where she became "jittery," but that she did not know if the plaintiff completely passed out (Tr. 332).

***Evidence Submitted to the Appeals Council After the ALJ's Decision***

The evidence the plaintiff submitted to the Appeals Council that was not duplicative of that already considered by the ALJ is summarized below:

On June 15, 2005, Wilma Spencer, F.N.P. (a nurse practitioner for Dr. Denise Whidby) completed a form indicating that the plaintiff had been unable to do any type of work since 2002 due to fibromyalgia and bipolar disorder. Ms. Spencer stated that the plaintiff was unable to concentrate, had constant pain, impaired memory, extremity weaknesses, and an inability to lift over 10 pounds (Tr. 243). It appears Dr. Whidby also signed the form (Tr. 243).

In October 2006, Ms. Staples wrote a letter stating that the plaintiff had been unable to work since January 2003, due to her physical, behavioral, and cognitive problems. She also noted that she had advised the plaintiff not to drive due to her reported seizures. She concluded that the plaintiff needed neurological and psychological evaluations, but could not afford them. Dr. Halyard also signed the letter (Tr. 300).

On November 29, 2006, Dr. Williams completed a form stating he had treated the plaintiff for fibromyalgia and syncope episodes, and that the plaintiff had been unable to work (Tr. 307). In his office note dated October 6, 2006, which was attached to the form, Dr. Williams stated that the plaintiff was "unable to do any type of work due to her mental illness and medical condition which has lasted since 5/14/01" (Tr. 308).

## ANALYSIS

The plaintiff alleges disability since December 31, 2003, due to fibromyalgia, asthma, insomnia, anxiety, and depression. She was 43 years old on her alleged onset date. She has a high school education and past relevant work as a secretary and salesperson. The ALJ found that the plaintiff's fibromyalgia and depression were severe impairments (Tr. 22). The ALJ further found that the plaintiff retained the residual functional capacity ("RFC") for light work. The ALJ further found that she was able to sit/stand/walk six hours each in an eight-hour workday, and she was able to occasionally lift 20 pounds and frequently lift 10 pounds. The ALJ limited the plaintiff to unskilled work due to her depression(Tr. 24). The plaintiff argues that the ALJ erred by (1) failing to find that her fibromyalgia met or medically equaled a listed impairment; (2) finding that the record did not document her sleep disorder; (3) failing to find that her lower back issues were a severe impairment; (4) failing to properly consider her subjective complaints of pain; (5) failing to give proper weight to the opinion of treating physicians Dr. Williams and Dr. Whidby.

### *Fibromyalgia*

The plaintiff first argues that the ALJ erred in failing to find that her fibromyalgia met or medically equaled a listed impairment. The regulations state that upon a showing of a listed impairment of sufficient duration, "we will find you disabled without considering your age, education, and work experience." 20 C.F.R. § 404.1520(d). A listing analysis includes identifying the relevant listed impairments and comparing the criteria with the evidence of the plaintiff's symptoms. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (stating that "[w]ithout such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination"); *Beckman v. Apfel*, C.A. No. WMN-99-3696, 2000 WL 1916316, *9 (D. Md. 2000) (finding that where there is "ample

factual support in the record" for a particular listing, the ALJ should perform a listing analysis).

> The ALJ found as follows:
>
>> I have considered the claimant's fibromyalgia under Listing 1.00 for the musculoskeletal system. Although the claimant has been diagnosed with fibromyalgia, there have been only intermittent findings of tender points and no diagnosis of exacerbation of pain. When examined on January 1, 2006, the findings did not show any problem with the extremities or pain. None of the examining physicians has noted a significant number of tender points. Thus, I find that the claimant does not meet the criteria of this Listing.

(Tr. 23).

Substantial evidence supports the ALJ's finding that the plaintiff's fibromyalgia did not meet or equal a Listing (Tr. 23, 24). As argued by the defendant, the plaintiff's fibromyalgia cannot "meet" a Listing, because fibromyalgia is not an impairment that is specifically addressed in the Listings. Further, "[f]or a claimant to qualify for benefits by showing that h[er] unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, [s]he must present medical findings equal in severity to all the criteria for the one most similar listed impairment." *See* Social Security Ruling (SSR) 91-7c, 1991 WL 231791, *5; 20 C.F.R. § 416.926 ("Your impairment(s) is medically equivalent to a listed impairment . . . if it is at least equal in severity and duration to the criteria of any listed impairment."). Impairments of the musculoskeletal system are addressed under section 1.00. *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00. The musculoskeletal Listings most similar to the plaintiff's impairments would be Listing 1.02 (Major Dysfunction of a Joint)[4] or

---

[4]Listing 1.02 requires:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of

(continued...)

Listing 1.04 (Disorders of the Spine)[5].  The plaintiff has failed to show that she has a gross anatomical deformity of any joint causing limitation of motion and an inability to ambulate or engage in fine and gross movements effectively, as required by Listing 1.02.  The evidence shows that the plaintiff retained full range of motion in her joints (Tr. 99-100, 113), and there was no evidence that she required an assistive device or had any difficulty ambulating.  Similarly, the plaintiff failed to show that her impairments equaled the criteria of Listing 1.04.  Listing 1.04A requires medical evidence of nerve root compression,

_____

[4](...continued)
joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;
OR
B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. 404, subpt. P, app. 1 § 1.02.

[5]Listing 1.04 requires:
Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. 404, subpt. P, app. 1 § 1.04.

14

limitation of motion of the spine, motor loss, sensory or reflex loss, and positive straight-leg raise testing. Here, an MRI showed only "mild" degenerative changes in the low back with no significant stenosis; straight leg raise testing was negative; and the plaintiff retained full range of motion in her joints, normal strength, and intact sensation (Tr. 99-100, 113, 138). Likewise, the evidence did not show the requisite spinal arachnoiditis (inflammation of the membrane surrounding the spinal cord) or pseudoclaudication (leg cramping caused by a stenosis and compression of the spinal nerve roots) under 1.04 B and C, respectively. Based upon the foregoing, this allegation of error is without merit.

### Sleep Disorder

The plaintiff argues (pl. brief 5-6) that the ALJ did not properly evaluate her alleged sleep disorder. The Commissioner acknowledges that the ALJ stated that the "clinical record [did] not document the problem" (Tr. 23), even though the plaintiff did discuss her sleep problems with her physicians (def. brief at 17). As argued by the plaintiff, the medical record shows multiple references to her complaints of and treatment for a sleep disorder. Loris Medical Center records dated March 19, 2004, list "sleeps poor" as a complaint, and the recording medical professional handwrote "not sleep well and depressive pattern" (Tr. 110). Dr. Williams stated that the plaintiff suffered from difficulty sleeping, insomnia, and anxiety-type of sleep pattern and further assessed her with insomnia (Tr. 111-12). Dr. Williams' note of January 19, 2004, provides that the plaintiff complained of and suffered insomnia first phase and worrying (Tr. 113-14). This same record also reflects that he prescribed Zyprexa one hour before bedtime for insomnia. Dr. Williams' note dated September 17, 2003, reflects the plaintiff's complaint of no sleep (Tr. 115). Dr. Williams' note of June 10, 2005, provides the plaintiff is unable to drive and she further complained that she could not sleep, and was having difficulty going to sleep and staying asleep (Tr.

192). Dr. Williams' note also provides that she could not concentrate and she could not remember.

The records of Health Care Partners of South Carolina, Inc. dated June 22, 2005; July 6, 2005; July 21, 2005; August 23, 2005; and December 22,2005, list insomnia as one of the plaintiff's chief complaints (Tr. 204, 207, 208, 210). On April 29, 2005, a doctor with Health Care Partners prescribed Vistoril for the plaintiff's sleep (Tr. 213).

Based upon the foregoing, the ALJ erred in concluding that the record does not support the plaintiff's complaints of a sleep disorder. Upon remand, the ALJ should be instructed to consider the plaintiff's sleep disorder along with the plaintiff's other impairments in determining her residual functional capacity.

### Lower Back Pain

The plaintiff next argues that the ALJ failed to properly consider her low back pain in determining her residual functional capacity for work. The ALJ noted that an MRI of the plaintiff's low back showed only "mild degenerative disc changes at L4-L5 and L5-S1 with no significant stenosis" (Tr. 25, see Tr.154). The plaintiff argues (pl. brief at 7-8) that the ALJ did not consider other findings in the MRI report, specifically that the L4-5 had "disc signal loss from desiccation with mild diffuse disc bulge and facet and ligamentum flavum hypertrophy" with contact with "the thecal sac but not producing significant stenosis" (Tr. 154). However, as argued by the defendant, the ALJ was not required to recite every piece of the report verbatim, especially in light of the fact that the physician who authored the report summarized the MRI findings – including those the plaintiff says the ALJ did not consider – in exactly the same way as the ALJ (Tr. 154 (concluding that the MRI showed "mild degenerative disc changes at L4-L5 and L5-S1. No significant stenosis")). See Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000) (stating that the ALJ "is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate

16

that it was not considered.") (citation omitted); *Dryer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (stating that the ALJ is not required to specifically refer to every piece of evidence in the decision). Based upon the foregoing, it appears that the ALJ properly considered the MRI findings in assessing the limitations imposed by the plaintiff's low back impairment.

### Credibility

The plaintiff alleges that the ALJ erred in concluding that her allegations were inconsistent with the medical evidence in the record. The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." Furthermore, it "must be sufficiently specific to make clear

to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." SSR 96-7p, 1996 WL 374186, *4.

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)     the individual's daily activities;

(2)     the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)     factors that precipitate and aggravate the symptoms;

(4)     the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)     treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)     any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)     any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, *3.

The ALJ specifically found that there was evidence of a physical or mental impairment that could reasonably be expected to produce the symptoms alleged by the plaintiff. However, he further found that the plaintiff's allegations "have been inconsistent with the medical evidence of record, the claimant's reports to her physicians, and the treatment sought and received" (Tr. 27). The ALJ explained:

Specifically, in February 2005, the claimant reported she shopped, watched movies and drove. In May 2005, the claimant reported she lived alone, ate breakfast, dressed, visited with her granddaughter, watched television, talked on the telephone, did household chores and drove. The claimant has described

18

activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.

As mentioned earlier, the record reflects work activity after the alleged onset date as a secretary from January 1, 2004, to January 30, 2004. Although that work activity did not constitute disqualifying substantial gainful activity, it does indicate that the claimant's daily activities have, at least at times, been somewhat greater than the claimant has generally reported.

(Tr. 27, 133, 189). The plaintiff argues that the ALJ missed the other questions on her February 2005 Daily Activities Questionnaire in which the plaintiff stated that she needed assistance from others in paying her bills, answering the questionnaire, and doing housework (pl. brief at 8; *see* Tr. 133, 135). However, a few months later, in May 2005, the plaintiff indicated to Dr. Simons that she was "able to do most household chores such as vacuuming, dusting, dishes and laundry. She is able to shop. She is able to drive, but limits her driving to about 5 miles from home," as referenced by the ALJ (Tr. 189). As argued by the defendant, the plaintiff's daily activities, while not alone conclusive on the issue of disability, substantially support the ALJ's credibility determination. *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994). Based upon the foregoing, this allegation of error fails.

### *Treating Physicians*

The plaintiff next argues that the ALJ failed to properly consider the opinion of Dr. Williams. The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §416.927(d)(2) (2006); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-2p. Furthermore, even if the plaintiff can

19

produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. §404.1527(d)(2)-(5). Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p, 1996 WL 374188, *5. As stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* 1996 WL 374188, *4.

In June 2005, Dr. Williams concluded:

> I feel that this patient is unable to do any type of work due to her mental illness and medical condition which has lasted since 5/14/01 and which can be expected to last for a continuous period of at least 12 months or longer in the future. It is my professional medical opinion that this patient has been and will continue to be disabled and unable to maintain gainful employment secondary to the above medical and mental illness.

(Tr. 192). The ALJ found as follows with regard to Dr. Williams' opinion: "I have given little weight to Dr. Williams conclusion that the claimant is unable to work because there is only a report of sad appearance poor affect, and subjective tenderness to support his conclusion" (Tr. 27).

> The plaintiff notes as follows:
>
>> Dr. Williams met, spoke to, and examined Plaintiff on several different occasions from 2004 through 2005. (R. 110-115, 192) Each report indicates his examination and prescriptions for medications. Dr. Williams' report of January 19, 2004 provides that he discussed with the Plaintiff information about fibromyalgia, which indicates that he examined and diagnosed Plaintiff from her symptoms presented. (R. 113) As for the ALJ mentioning subjective tenderness provided in his record dated June 10, 2005, the ALJ ignored the doctor's objective findings such as tenderness over the lower lumbar musculature and over the SI joints. (R. 242)

(Pl. brief at 9-10). The plaintiff argues that the ALJ failed to properly consider Dr. Williams' opinion based upon the factors described above. This court agrees. Upon remand, the ALJ should be directed to evaluate Dr. Williams' opinion in accordance with the above cited law.

> Lastly, the plaintiff argues that the ALJ erred in failing to consider certain medical documents and opinions from the plaintiff's treating physicians. Specifically, the plaintiff notes as follows:
>
>> On July 13, 2005, Dr. Williams issued an opinion that Plaintiff suffers from a mental illness and medical conditions that negates her ability to work. (R. 301A) This record was not shown in the ALJ's Decision as a record he considered. (R. 2). He further delivered opinions that Plaintiff suffered from fibromyalgia and syncope episodes on November 29, 2006 which was not considered by the ALJ. (R. 307). Clearly, with the ongoing face to face interaction he had with the Plaintiff and the number of records and opinions he gave, the ALJ's decision is not supported by substantial evidence.
>>
>> Denise Whidby, M.D. also rendered an additional opinion not considered by the ALJ. On June 15, 2005, Dr. Whidby

evaluated her for fibromyalgia, and a second opinion for her
bipolar disorder. (R. 301A) She, like Dr. Williams, agreed that
Plaintiff suffered from a bipolar disorder. (R. 301A, 308). Dr.
Whidby also limited the Claimant to lifting ten (10) lbs. at any
given time, and Plaintiff had weakness in her extremities. (R.
301). The ALJ only limited Claimant to a twenty (20) lbs. lifting
restriction. Obviously, the ALJ did not consider this evidence
and it was not listed as an exhibit to the ALJ's Decision.

(Pl. brief at 10-11).

As argued by the defendant, the July 13, 2005, opinion from Dr. Williams
referenced by the plaintiff is the same opinion discussed above as being dated June 10,
2005.  Apparently Dr. Williams performed the examination of the plaintiff on June 10, 2005,
and he signed the report on July 13, 2005 (*see* Tr. 192).  This report was specifically
considered by the ALJ as discussed above. With regard to the November 29, 2006, opinion
of Dr. Williams in which he noted that he treated the plaintiff for fibromyalgia and syncope
episodes on a monthly basis (Tr. 307), this opinion was not part of the record before the
ALJ as it was submitted by the plaintiff to the Appeals Council after the ALJ's decision.
Upon remand, the ALJ should be instructed to consider both the 2005 and 2006 opinions
of Dr. Williams as to the plaintiff's limitations.

The plaintiff also argues that the ALJ failed to consider an opinion from Dr.
Whidby dated June 15, 2005, in which Dr. Whidby stated that the plaintiff was "unable to
do any type work due to her medical condition . . . ."  Dr. Whidby further opined that the
plaintiff "has the following permanent restrictions: . . . unable to concentrate, constant pain,
impaired memory, weakness in extremities, inability to lift over 10 lbs of wt. at any given
time" (Tr. 243).  Again, this opinion was not part of the record before the ALJ as it was
submitted by the plaintiff to the Appeals Council after the ALJ's decision (Tr. 240-41).  As
this evidence is now part of the administrative record and this court has recommended that
the case be remanded for further consideration by the ALJ, this court further recommends

that the ALJ should be instructed upon remand to also consider this later opinion of one of the plaintiff's treating physicians in assessing the plaintiff's residual functional capacity.

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.


s/William M. Catoe
United States Magistrate Judge

November 19, 2009

Greenville, South Carolina